May I please report, Michael Malachek appearing on behalf of Pell and Sequenom. I've asked to reserve two minutes for rebuttal. I'd like to focus my comments this morning primarily on the claim construction issues, as that was the main focus of the district court decision. The district court has moved the Markman hearing to June in the hopes of having guidance from this court on that issue. I will, based on its origin... This is a preliminary injunction. It is, sir. What are you suggesting we should do with claim construction? So in order to... Notice you both spent a lot of time fighting about the standard of review we're supposed to apply. Correct. You'd start there. And in order to reverse the ruling of the district court, this court needs to find that there has been a showing of a likelihood of success on the infringement issue. That issue boils down entirely to a claim construction issue. So we need to persuade this court that the errors were made by the district court on the claim construction issue in order to do that. There are no disputed facts underlying the infringement contention other than the claim construction. The error of finding that there was... No disputed facts other than the claim construction. Are you saying there are disputed facts within the claim construction? No, I apologize. I misspoke. Well, but no, I'm not so sure you need to withdraw on that very much. How do we determine what CFFDNA is and all of the implications of this if we don't go into some rather detailed technical facts? That's correct. That is correct. The point I was trying to make is that the error in the claim construction is reviewed de novo. It's a pure issue of law. And then the... Factual issues are reviewed de novo? Obviously, this is an issue that's under discussion in the federal circuit. Of course, it is. And we all know that I've got my tongue squarely in my cheek when I'm asking some of these questions. But it seems like you folks have put this issue somewhat in contention, haven't you? That's correct. That's correct, Your Honor. And the district court... De novo? En banc? We are not, Your Honor. We're asking the law that's being applied today to be applied. The district court has made a ruling that this phrase known in advance should be added to the claim. That known in advance language appears nowhere in the claim. I understand. You'd like a reversal. So you'd want the de novo standard of review so that we can do whatever we want with the claim construction. I'm not sure your Understood, Your Honor. Could we talk about one of these claim constructions, the amplifying? It seems as though your own experts agreed with the district court's claim construction. The statement of what is not clear is that amplification and enrichment are overlapping subsets. Many forms of performing amplification would also result in enrichment. But many forms would not. There are subsets on either side. There's a clear and very straightforward claim differentiation on two separate independent claims. If you look at Claim 19, Your Honor... I'm a little confused here. At 1133 of the record, he says, the person of ordinary skill in the art would also understand fetal DNA enrichment to have its ordinary and customary meaning of increasing the concentration of fetal DNA relative to the maternal DNA in the sample. And that's not what the accused does, right? I believe you're reading from their expert's report. Our experts said that amplifying means increasing the number of copies and that enrichment means increasing the relative concentration. And if you increase the number of copies in some instances without removing the other DNA, you will increase the relative concentration, correct? But you can increase the relative concentration by removing some of the starting sample as well. There are ways to do it without amplification. And if you look at Claim 19, it says, practice Claim 1, which requires amplification without a step of fetal DNA enrichment. So the patentees were clear that there were enrichment steps that were separated apart from amplification steps and amplification steps that were separated apart from enrichment steps. There is also a substantial overlapping portion of that set where enrichment and amplification can be done in the same process. So that is the fundamental confusion that the district court had in relying on that one answer, that they can be the same from our experts. And the claim differentiation argument is clear. You could not, if enrichment is the same as amplification, Claim 19 makes no sense whatsoever because it says do amplification without doing enrichment. That is what the claim says. Likewise, Claim 3 is amplification a rather standard step in this kind of biotechnology to amplify what you need to work with so you can detect within it what you're looking for? The use of PCR and other amplification techniques was standard at the time the patent was filed in 1997. That is correct. Also with standard were the fractionation steps, also standard were detection steps. That's all true. If one ends their 101 analysis at that point, Your Honor, one has failed to follow the Supreme Court law that specifically says to dissect the claim into its elements and consider them not in combination and out of context is not what we are asking you to do. Right? That's the specific teaching of the Supreme Court. And that is what Ariosa continues to urge this court to do. Simply say the tools that were available were known. If you look at Deere, it tells us... In this case, the starting material, the thing you're analyzing was completely unanticipated, right? Completely unknown at the time. It was a big departure for someone to look at that. Garbage, you threw it away. Exactly. And compare that, Your Honor, to Deere, where the equation was known, using heat and a time limit on the temperature of the rubber was known. And Deere says, look, it's often going to be the case that all of the constituent parts are things that are known. The issue is, did the patentee combine them in a new and novel way to do something that had never been done before? And here, that's literally the case. It's widely recognized that this is a dramatic departure in a long sought after result. And I think... What way is that? Is that because you're using a substance that before was discarded? Is that what's novel here? What's novel is that there was an insight, a discovery, that that substance was discarded and that the fetal DNA would be in a high enough concentration. They were trying to work on that. The idea that it would be easier to work on the cell-free fetal DNA was a dramatic departure. And it's widely recognized and is in the record over and over again. So what's the inventive concept here? So the inventive concept is not just to work with that. That's part of the inventive concept. But then also to look at one portion of that sample, the paternally inherited portion, and also to use amplification to detect it. And what the Supreme Court... If amplification, detection, and fractionation all existed at the time of the invention, then what's new? First of all, what's new is that they had done it. This was the very first time that anyone had done it to detect this. Just like in deer, there was nothing new about a curing machine. There was nothing new about using heat and time levels. There was nothing new about that equation that was well-known. But nobody had ever used them in that combination to achieve that result. Same thing here. There's nothing new about fractionation or amplification or detection, but no one had used them in combination. And I think it's very, very helpful, actually, to look at what the Supreme Court tells us to very carefully look at. Have they taken over the whole field? Have they merely drafted around this to take over the whole natural law? And if you look in the record, there are... Natural law. What's the natural law? There's a phenomenon here. I'm using the wrong word. The phenomenon of the... What's the natural phenomenon? The presence of the cell-free fetal DNA. The mere presence of it. At age 22... In the end, you're simply detecting or you're observing a natural phenomenon that has existed and has continued to exist. You haven't changed anything with respect to getting to the point to where you have actual detection. I mean, you end up looking at the CFF DNA, but you haven't done anything with that, have you? No, that's not true. You've amplified it up. You've created a significant... Well, amplification, you made more of it. You made more copies. But a copy is a copy of the same thing. I understand that, Your Honor, but it's a significant manipulation of the sample to amplify it and to undertake a detection step. You're using a portion of the sample that researchers were routinely throwing away. And if you look at the issue of has the claim taken over or monopolized or preempted the field, the answer is no. There's no dispute that there are two peer-reviewed examples in the record. And I want to particularly point you to A2273. It's a peer-reviewed article about doing this without amplification. And in that article, they're bragging about the fact that their innovation to do this test without amplification makes it a better test. It's clear demonstration of the fact that this is a novel application that others have been able to innovate around. But amplification was well known, right? Amplification was well known. So it was using heat and to cure rubber. All the steps were well known. All the steps were standard tools that were available at the time. You're saying what was now, what's different here is the underlying material. No, I'm not. I'm saying it's not just the underlying material. I'm saying it's the use of a particular portion of the sample, the plasma sample. I'm saying it's the amplification of that, a particular portion of it, the paternally-inherited nucleic acid, and detecting that. That was unknown how to do that at the time. They taught the people skilled in the art how to do it, and it's been widely recognized in the field as an enormous departure from what they were trying to do. I would point the court towards Deere, which says the machinery pointed out as suitable to process may or may not be new or patentable, right? Whilst the process itself may be altogether new and produce an entirely new result. That's what the Supreme Court has found for us. We're routinely going to be confronted with method claims where the underlying steps that are brought to the method are known already. Had anyone ever done this process as it's claimed before you did? No, absolutely not. And has anyone ever received the result that you received before you did it? No, absolutely not. And the record is replete with the statements of experts in this field saying this is a dramatic departure that has enabled an entirely new kind of science. Absolutely. Could I bring you to a different issue here? And that is, my understanding is that you don't dispute that the preliminary injunction would destroy their business, right? We do not dispute that they are a single product company that has entered into this knowing that they're living under the shadow of this patent. Okay, so what case has sustained a preliminary injunction where the effect of it would be to destroy the in-joined company's business? There is not a case that I can point to that that specifically has been discussed. If this court were to establish the rule... What is its effect on you? What is its effect on you if this preliminary junction does not go into effect? It means that every day we are losing key accounts, key thought leaders. We're experiencing price erosion that's going to be pressed down by the... I thought the district court concluded there was no price erosion. That's not true. Actually, the district court acknowledged that there were lost accounts of price erosion in the opinion at, I want to say, it's 814 or 815. It didn't believe the evidence that it was irreparable, but it found that there was evidence of lost accounts of price erosion. Well, I know about the lost accounts. Where does he say price erosion is? At 819, Your Honor. That line. It doesn't take much of an economics degree to decide if they come in at 130, your price is going to have some effect on your ability to attract people to your product, is it? That's correct, and in here we have a special circumstance where you have insurance companies that are really playing an important role in that price and keeping it down once it's been set, so it's a particularly dramatic thing. But I want to get to the issue of the destruction of their business. If this court were to set a rule that a new company can enter a business with a single product under the known threat of a patent problem, and if that single factor means we cannot grant preliminary injunctions, that rule is a get-out-of-jail-free card to every startup out in Silicon Valley where I work, that they can go out knowing they're working under that and say, hey, this is our only product, we're on the market. Is this a factor to be considered as part of the analysis? It is a factor to be considered, absolutely, but if it is a determinative factor that it will put them out of business, it will simply give a get-out-of-jail-free card, absolutely, on that issue. On the claim construction issue on the known in advance, I'd like to make sure we get that addressed, because I want to be clear that if that is upheld, that would result in writing the RHD example completely out of this patent. The RHD example, we do not know whether the father is RHD negative or positive before we do that test. It is not known in advance. After the assay steps are done and the detection results are available, one can then conclude whether or not the father is RHD negative. All we know in advance is to look at a particular area where the father and the mother may have contributed differential alleles to the fetus. And once we run those two tests that's there, that known in advance claim construction would completely remove the RHD example from the patent. I see I'm into my rebuttal time. One final question. You agree that under their test, they're enriching both the fetal and the maternal DNA, correct? So it is an interesting question. The claim construction that has been adopted, it says relative to the rest of what's in the samples. They are increasing at a particular location the same amount of maternal and but relative to other places in the DNA, they are dramatically increasing the concentration of that. So the claim construction itself is ambiguous as to the denominator as relative to what. But at that particular locus, I would agree that it is the same amount of increase. Thank you, Mr. Malachek. Mr. Kindler. Good morning, may it please the court. How did your company learn how to do this process? All by itself. You just came up with how to analyze the discarded CFF DNA on your own. The way we do it. No, did you learn? How did you learn to use CFF DNA? CFF DNA was discovered in 1997 by Dr. Lowe and Dr. Wainscote. That's what sequenom will say. That's not entirely clear. But how did you learn to use that sample to detect the fetal anomalies? We had to use what's called next generation sequencing. In other words, in 1997, it wasn't. How did you learn to use the CFF DNA? We learned to use the CFF DNA by applying what's called next generation sequencing machines. You copied the patent. Absolutely not. You didn't learn anything from the patent. You're completely ignorant of the patent. We were not ignorant of the patent. We learned nothing from the patent that taught us how to do what we do. The only thing that we know from the patent that people knew in 1997 was that cell-free DNA can be found in maternal serum and plasma. That's the patent. That's the central element of the patent. That is a central element. It is the central element. It's the part that no one else knew how to do. Is that a common scientific fact? This is just an observance of a natural phenomenon, isn't it? It is the detection of a natural phenomenon. The following statement I'm going to make, I believe, is completely... So the CFF DNA was not invented? No. It's always been there. In fact, in 1996... Has anyone ever looked for it in the place you looked for it, which was the subject of the patent? Your Honor, there is in the record below an invalidity argument based upon a publication from 1995 by a Russian scientist. That issue was not addressed by the district court in its opinion. It didn't reach either a prior art issue and it didn't reach an enablement issue. It focused on hardship, irreparable harm, balancing test. The patent itself discloses a very, very important fact, and that is it was known in 1996 that you could detect cell-free DNA using amplification, fractionation steps, in serum and plasma. And they did it with tumor DNA. The only difference between that example from 1996, which the patent recites, it's in column one. Yeah, that's the part that they used to look at and they got nowhere with, the stuff they threw away. No. I'm referring to something different. Column one of the patent actually refers to the fact that cell-free DNA and the detection of cell-free DNA, actually tumor cell-free DNA, using amplification, fractionation, detection was done. The only thing that's different about this patent is the source of the cell-free DNA. This is fetal cell-free DNA. That's what they found in maternal serum and plasma. We're talking about the source of the DNA and the final detection within that source. The source itself is natural, isn't it? The source is completely natural. It's not a new chemical. It's not a new composition. It's not transformed. It's not manipulated. They make more copies of it. But what happened is that some people before Drs. Low and Wainscote, if you assume they were the first to discover it, let's just make that assumption for purposes of this argument. We don't agree with that, but let's just assume that's the case. The world you supposedly come from seems to acknowledge them as great innovators and advancers in this area, right? I would say that the world has said that the finding of the publication of their article, which talks about cell-free DNA in maternal serum and plasma, was an extremely important discovery. It is a discovery of a natural phenomenon. What was not new was anything they did to find it. What was not new was anything they did to discover cell-free DNA in serum or plasma. They did exactly what was done before, and in fact, they said this repeatedly to the patent office, I imagine, because they were worried about getting rejections on written description grounds. So Dr. Low and Sworn declarations, and throughout the patent application, throughout the patent prosecution, they point out that all these steps were known, and the combination is even newer. The steps were known and they were done on something that had never been done on before in a sequence that had never been used before to receive a result that had never been received The sequence had been used before. The exact sequence had been used before to detect cell-free DNA. The patent itself recites that. It identifies the articles from 1996 where that was done. So the sequence isn't new. The combination isn't new. The looking for cell-free DNA isn't new. Looking for cell-free DNA in maternal serum or plasma isn't new. What's new? The fact that there actually are bits of fetal cell-free DNA in the serum or plasma. That was what was discovered, but the process of finding it and detecting it, the combination of steps that was into new uses that revolutionized science has acquired great acclaim for these inventors, and then some people come along and copy them. What should our response be? But the claim is not about a new combination of sequences. Had anybody just looked at the paternal before? Had anybody just looked at paternal DNA before? Yeah, look for the paternal side. You talked about they used to look at the mother's DNA. That's true. Now they're looking at the fetal extract and the paternal component of that. Had that been done before? Beforehand, people looked at a lot of different things. They were mostly looking at... Now proceed in telling us why that doesn't decide this case. It doesn't decide the case for the following reason. Here's what happened beforehand. This is not a new combination of tools. Nobody's saying the tool... Well, the tools have been used in a different way to receive a thing both in its fetal origin and the part of the fetal origins material that you're looking at. Let me say this a different way. The only thing that is different about the 540 patent and what existed the day before the 540 patent is the discovery of the natural phenomenon that fetal DNA, fetal cell-free DNA, also exists in serum and plasma. And that is the only difference between the day before the 540 patent... And you had studied the paternal side of the fetal DNA before? Had we studied that? My client started in 2010. So the answer is no. We came up with a completely novel way of doing this. What we do is completely different than what every other company does in terms of the process that we use. The patent itself though is written to try to broadly cover... Have you licensed the portions of the patent which you do use? We have no license to this patent because we think the patent is not infringed and we think the patent is not valid for both of those reasons. Your honors asked a question at the beginning about the standard of review and there are two important parts about that standard of review. So I wanted to address that just briefly. The first is that there is an abuse of discretion standard that applies to clearly everything except probably claim construction. But I want to get to that in a second. So the balancing of hardships, the irreparable harm determination, the public interest factors, all of those are subject to an abuse of discretion standard. The claim construction standard is a little different on a preliminary injunction. I think as this court knows. And that in that context, as the Jack Gutman case says, it says at the preliminary injunction stage we will not lightly intrude upon a district court's discretionary decision to issue only a tentative claim construction. That's what Judge Ilston did. She said I'm making a claim construction. I'm doing it for purposes of this motion only. Can I ask you about the actual claim constructions before we run out of time here? Please. In terms of the amplification, if I understand that the district court said that amplification meant that the fetal DNA has to be amplified without also amplifying, say, the maternal DNA. What the district court said was that you have to enrich the target, which is the paternally inherited fetal DNA, relative to the other DNA. Relative to the maternal, right? As opposed to everything else, correct. So, and they've admitted that you enrich both the fetal DNA and the maternal. That's correct. What we do on what's called the polymorphic assay is we look at sequences on chromosomes 1 through 12, and then we just work with those sequences. And we actually compare certain loci on those sequences, and we amplify all of it. We amplify maternal. We amplify maternal. We amplify it all. So I don't think there's any question that under the court's claim construction of amplifying, we don't infringe. They don't contend that. Under the court's construction of amplifying, we don't infringe. And if the only thing the court looked at was the deposition testimony of their expert, as opposed to the attorney-constructed declaration of their expert, their expert gave an absolutely unqualified, unambiguous answer to an important question. The question that turns upon their interpretation of amplifying, which is that it's different than enrichment. Their expert was asked, is amplifying DNA the same as enriching DNA? Answer, fundamentally. That's not ambiguous. Do they agree with the quotation from apparently your expert that I read earlier about the definition of enrichment? Everyone, I think, agrees on the definition of what enrichment is. I don't think there's any dispute that enrichment means the increase in the copying of DNA. Target DNA, that would be the fetal DNA. That would be maternally inherited DNA versus everything else that's out there, whether it's maternally inherited or DNA of the mother herself. Okay. And they say, though, that that construction is inconsistent with Claim 19. What's the response to that? Well, let's look at what Claim 19 actually says. So Claim 19 adds a limitation to Claim 1, Claim 1 being the most general claim of the patent. And the limitation that's added is, quote, fetal DNA at a fractional concentration of total DNA of at least 0.14% without subjecting it to a fetal enrichment step. That doesn't say you don't enrich. It just says your starting material is at least 0.14%. And that's all that it tells you. It doesn't say don't perform enrichment. It just tells you where you start. And you start without enrichment. And well, it's Claim 1. No, in 19, the idea is that you start without enrichment, but you're saying it doesn't prevent later enrichment. All Claim 1. Is my statement inaccurate? I can't answer it exactly yes or no. I can get almost there. Okay. Because Claim 1 requires amplification, and there's no difference between amplification and enrichment as their expert conceded when he spoke at his deposition. There's no difference between it. The examiner recognized no difference. Okay, but what I'm trying to get at is what enrichment step 19 is talking about. It's talking about no enrichment before you arrive at the 0.14. That's correct. It's saying because Claim 1 requires amplification, and there's no difference between amplification and enrichment. It's the same thing. The examiner used the terms interchangeably in the last office action. Literally used them interchangeably. If you look at the citations from their brief, the examiner uses the terms interchangeably. So on that ground, all the Claim 1... Can you address real quickly the well-known construction before you move on? You mean the known in advance construction? Yes, well-known in advance. Yes. Known in advance, Your Honor, comes from the following. The paternally inherited limitation comes from a required amendment by the PTO. They rejected the patent every single time saying you have only enabled the detection of paternally inherited DNA where that DNA is either on the Y chromosome or on the RHD gene. And then they said in an examiner interview, you can have your patent if you change it to add paternally inherited. And in the remarks written by the patentee, what the patentee explained as to why it was added, it was added because the PTO said that paternally inherited was enabled. But the only thing the PTO found to be enabled were the five experiments disclosed in the specification. And they said that in every single office action. Mr. Malachek said that the R construction, the quartz construction, excludes the RHD gene example. That's just not true. It's not true for the following reason. You know in advance that the mother is RHD negative. That means you know in advance that if the claim is practiced because the claim requires the detection of paternally inherited nucleic acid, you know it comes from the father because it can't come from the mother. If the father is also RHD negative, there is no practicing of the claim. Weren't the rejections because you can't distinguish maternal from fetal and therefore they limited it to paternal? I think that was so clear from the record. I couldn't understand your explanation. There were also statements in the record. Also? I thought that was the driving point. No, actually the driving language was the one that I actually just stated, which is that the patent does not enable the detection, patent excuse me, only enables the detection of paternally inherited nucleic acid where... Let's hear from Mr. Malachek. Can I add just one sentence? Let's hear from Mr. Malachek. Thank you, Your Honor. Thank you, Your Honors. So first on the issue of the amplification construction, in addition to the claim differentiation on Claim 19, you also need to look at Claim 3. Claim 3 says, doing this invention wherein the primer that you're going to use for the amplification steps is fetal specific. So if you use a primer that is specific to, for example, the Y chromosome and therefore specific to the fetus, you will get a amplification that increases just that Y chromosome region. The negative pregnancy of Claim 3 is that you can use a primer that is not fetal specific. That will amplify the maternal DNA and both the maternal and fetal contribution, excuse me, both the maternal and paternal contribution from the fetus. So again, that's an independent claim differentiation. And I would also point the court to Columns 10 and Columns 14 and 15 where exactly those kinds of nonspecific amplification processes, which would increase the total concentration of DNA irrespective of its source, are right in the patent. So again, this claim construction would read examples and claims right out of the patent. On the issue of whether or not it's transformed or not, I understand the Mayo case is on review, but this court did distinguish between the kinds of steps, isolation, that's very similar to the kind of amplification step. While you are making copies, you're selecting regions. It's not in its natural state anymore. The fractionation step takes it out of its national state. There's a substantial amount of transformation of the material that goes on during the course of this assay. This is not like the cases that this court has been to say, look at some things and compare it, make a comparative diagnosis. Look at a metabolite level. That is not the case here. These are... In MIRA, we had a situation where you took a DNA sequence, you severed it, withdrew it, took it out of its natural state, and then went on with the process. Where in this invention, where is there that type of separation? It seems to me that at the end of the day, at the process, what's happening is you're detecting, you're observing the CFF DNA, and that what you're observing has remained in its natural state. That is not correct. Other than the fact it's outside the human body. That is not at all correct, Your Honor. There are multiple steps that happen. First, the blood sample in this patent, but not the way other people practice it. Another example is a lack of monopolization. They fractionate the blood, so they take it apart into its constituent components. Then the amplification step is very similar to the isolation step. It is effectively an isolation in the sense that it dramatically increases a particular arbitrary portion of the genome. It brings that up. It's the same as cutting a piece out. It's exactly the same mechanically. It's another way to isolate a particular segment. But the key is we're not patenting in this case the fragment, are we? We're not patenting CFF DNA. We are patenting a method applied to it to detect a birth defect. Absolutely. We're not patenting a portion of what was once in the body. Absolutely not, Your Honor. We're not even close to that. But the steps you're taking are already well known. That's true, Your Honor. We don't dispute that whatsoever. So were the steps in Deere, where the Supreme Court very clearly told us if you do an analysis that says look at the steps and see that they were known before the patent was filed, you have not done your job. You must look at them in context. You must look if there's been a monopolization or preemption of all uses of that natural phenomenon. There is undisputed record evidence that that is not the case here. All right. Thank you, Mr. Malachick. Our next case is...